UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JOSEPH HARTSOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00289-JMS-MKK |
| | ) | |
| IDOC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Order Denying Motions for Preliminary Injunction, Granting Motion Challenging Plaintiff's Entitlement to IFP Status, and Denying Motion for Counsel**

Plaintiff Joseph Hartsock is an Indiana Department of Correction ("IDOC") inmate who is housed at Putnamville Correctional Facility ("Putnamville"). Mr. Hartsock is a Seventh Day Adventist who adheres to a vegan diet due to his faith. Mr. Hartsock filed this civil rights action alleging that the defendants are violating his religious beliefs and his right to an adequately nutritious diet by serving him vegan trays that are contaminated with animal products and other contaminants. He amended his complaint to add claims that some staff members were retaliating against him by engaging in behavior that made it more difficult to adhere to his vegan diet and/or litigate his claims related to his diet. *See* dkt. 59 (Order Screening Amended Complaint).

Pending before the Court are two motions for preliminary injunction, dkts. [5] and [22], a motion challenging Mr. Hartsock's entitlement to IFP status, dkt. [57], and a motion for counsel, dkt. [66].

**I. Motions for Preliminary Injunction**

**A. Mr. Hartsock's Motions**

Mr. Hartsock's first motion, filed contemporaneously with his complaint on June 13, 2023, requested a temporary restraining order that would compel IDOC and Aramark (the company with

whom IDOC contracts to provide inmates' food) to provide him with a nutritionally adequate vegan diet or provide him with packaged vegan meals. Dkt. 5. Because Mr. Hartsock sought relief that would exceed 14 days, the Court construed the motion as a motion for preliminary injunction and directed the defendants to respond. Dkt. 10 at 7 (citing Fed. R. Civ. P. 65(b)(2)). Mr. Hartsock then filed a second motion for preliminary injunction on August 2, 2023. Dkt. 22. He requests the same relief in that motion. Dkt. 23 at 1.

      i.      **Allegations in the Motions**

Mr. Hartsock is a Seventh-day Adventists and has followed a vegan diet since he was 15 years old consistent with his religious beliefs. Dkt. 24 at 1, ¶ 5. Mr. Hartsock alleges that he is being prevented from receiving a nutritionally adequate vegan diet that comports with his sincerely held beliefs, and that he is being retaliated against for complaining about it.

The IDOC has a vegan diet program available to inmates. *Id.* at 1, ¶ 4. IDOC Policy defines vegan food as a "prepared food item that is totally void of meat or meat by-products" and explains that a vegan diet "contains no meat, eggs, dairy, or other animal products." *Id.* The policy is silent as to matters involving cross-contamination of food preparation equipment. *Id.*

Mr. Hartsock alleges that several issues with the administration of the vegan diet have resulted in him being unable to eat the meals he is served, lest he violate the tenets of his religion or expose himself to unsafe foods that cause illness. These issues include the following, as described in Mr. Hartsock's August 1, 2023, affidavit (dkt. 24):

- Inmates who work in the kitchen prepare vegan and non-vegan food, and they are allowed to use the same utensils, pots, and pans when preparing these foods, which results in the vegan food becoming contaminated with animal products. Mr. Hartsock has witnessed inmate kitchen workers handle vegan and nonvegan food without changing gloves (*id.* at 1−2, ¶¶ 6, 8);

- Commissary items are not labeled as vegan (like kosher and halal foods are), so Mr. Hartsock cannot purchase food from commissary to supplement the diet provided

- through the vegan program. Further, because he is indigent, he cannot afford to purchase food from commissary to replace the diet provided by the IDOC (*id.* at 2−3 ¶¶ 7, 12);

- Inmate workers will serve vegans non-vegan food items including cheesy potatoes, cake, milk, tuna, chicken, etc., and Mr. Hartsock has also received vegan items contaminated with mice feces or mold (*id.* at 2, ¶ 8);

- Mr. Hartsock has filed grievances about being served contaminated or non-vegan food, and both IDOC and Aramark staff respond by telling him that he should alert a staff member at the time that his tray is contaminated so he can be provided a new one. Mr. Hartsock, however, fears doing so because he believes that inmate kitchen workers will retaliate against him since there are only a handful of vegan inmates at Putnamville, making vegan "snitches" easily identifiable (*id.* at 2, ¶ 9);

- All vegan food is served on Styrofoam trays, which are routinely heated via warmers or are placed in close proximity to heat sources. Styrofoam is known to leach dangerous chemicals into food when heated (*id.* at 2−3, ¶ 10);

- Mr. Hartsock stopped eating the prepared vegan trays around January 2023 because he believed they caused him to vomit or have diarrhea. His symptoms resolved when he stopped eating from the vegan trays. In order to be nourished while adhering to the diet, he would barter packaged vegan items like peanut butter packets or fruits with peels on them to avoid the cross-contamination, but he was no longer able to do so once he was placed in a restricted housing unit ("RHU") (*id.* at 3, ¶ 11);

- Mr. Hartsock has spoken with Putnamville and Aramark staff on over 100 occasions about his concerns, but they have failed to fix the problems with the vegan diet program. In May 2023, when he was housed in a restricted housing unit ("RHU"), Mr. Hartsock informed several IDOC defendants (Officer Paxton, Sgt. Clampit, Sgt. Blackburn, and Officer Prosser) that his trays contained non-vegan food or evidence of rodent activity, but they failed to intervene or provide a replacement tray (*id.* at 3−4, ¶¶ 13, 19);

- Mr. Hartsock has suffered from pain in his lower back near his kidneys since March 2023. At a June 2023 chronic care visit with a nurse, Mr. Hartsock informed the nurse that he believed some of his problems were attributable to his poor vegan diet, and the nurse advised him to discuss the issue with Aramark staff (*id.* at 5, ¶¶ 20−21);

- Mr. Hartsock lost 24 pounds between May 21, 2023, when he was placed in the RHU, and June 15, 2023, when he was released from the RHU. He sought additional mental health services due to his anxiety and stress caused by the lack of adequate vegan diet, but a non-defendant mental health professional refused to change his mental health code so he could receive increased access to services. Mr.

3

- Hartsock attributes a vitamin B12 deficiency to his inadequate vegan diet. (*id.* at 5–7, ¶¶ 23, 39)

- Mr. Hartsock alleges that some of the defendants have retaliated against him by (1) confiscating 47 inmate affidavits about nutritional/sanitation problems; (2) deleting his computer file that had legal research and exhibits about the problems; (3) temporarily changing his diet preference to a "lacto" diet; (4) ordering inmate diet workers to take his vegan card; refusing to provide vegan inmates with peanut butter packets while still providing those packets to non-vegan inmates (*id.* at 6, ¶¶ 26–30, 36).

- Mr. Hartsock alleges that since service of his complaint, nearly 90% of his vegan diet sacks have displayed "mice activity and/or mold" but he does not elaborate about what he has actually observed (*id.* at 6, ¶ 28).

### ii.   Responses

Defendants IDOC, Bumgardner, Paxton, Clampit, Blackburn, Bault, Prosser, Clark, Zatecky and Humrichouser ("IDOC Defendants") and Aramark, Smith, French, and Pherson ("Aramark Defendants") responded in opposition to Mr. Hartsock's motions for preliminary injunction, arguing that he is unlikely to succeed on any of his constitutional claims because he is provided with a nutritionally adequate vegan diet. Dkts. 56, 58. They acknowledge that, except for a period from April – August 2023 when he was on a lacto-ovo diet (vegetarian diet plus dairy and eggs), Mr. Hartsock has been on a vegan diet. Dkt. 56-1 at ¶¶ 6–9, dkt. 58-1 at ¶ 6.

Defendant Brittnee Smith, the Food Service Director at Putnamville, attested that the vegan diet program is administered in accordance with IDOC policy. Dkt. 58-1 at ¶¶ 3, 7. According to her, there are no dedicated vegan pots and pans for the vegan diet, but these cookware items are always washed and sanitized before vegan dishes are cooked in them. *Id.* at ¶ 7. This is to promote efficiency and is in line with IDOC policy; she has no authority to purchase separate pots and pans for vegan-use only. *Id.* There are, however, dedicated utensils for the vegan diet which are kept in a locked cabinet. *Id.* at ¶ 8. Aramark employees sign those utensils out and give them to inmate workers assigned to prepare the vegan meals that day. *Id.* at ¶ 8.

4

The vegan diet pattern is prepared by a licensed dietician employed by Aramark. *Id.* at ¶ 9. The vegan diet pattern is then reviewed and approved by the IDOC. *Id.* Samples of the vegan diet plan show that the plan provides for a daily range of 2500 to 2800 calories. Dkts. 56-2, 56-3. Ms. Smith explained that Aramark staff prepare sample trays for the vegan diet to ensure they comply with the approved diet pattern, and if foods are present that do not comply, the food items are removed. Dkt. 58-1 at ¶ 11. Ms. Smith has no authority to change the vegan diet by providing Mr. Hartsock with packaged vegan meals; such a change would occur only if a registered dietician created a different diet which was then approved by IDOC. *Id.* at ¶ 17.

John Schilling, the Director of Contract Complaint for IDOC, oversees the food service contract with Aramark and performs audits of the food service operations at IDOC facilities. Dkt. 56-1 at ¶¶ 2, 5. As part of the audits, he reviews operations to ensure the contractor is fulfilling IDOC policy requirements and state board of health regulations. *Id.* at ¶ 5. His staff conducted facility audits of Putnamville in April and August 2023 and found that the facility was compliant in personal preference diet tracking, personnel hygiene, and general sanitation. *Id.* at ¶¶ 13−14. Further, the inspectors found no evidence of vermin. *Id.*

Ms. Smith acknowledged that there are occasional issues with rodents, but the problem "is not pervasive." Dkt. 58-1 at ¶ 14. The IDOC provides pest control services to keep rodents out of the kitchen. *Id.* If she observes a rodent or feces in the kitchen, she addresses the problem immediately and does not serve contaminated food to the inmates. *Id.* Ms. Smith regularly eats the meals served to inmates at Putnamville, so she has personal knowledge regarding the food. *Id.* at ¶ 19. If Mr. Hartsock receives a tray that has issues—such as rotten/moldy food, rodent feces, or non-vegan items—the IDOC has a tray replacement policy wherein the inmate can bring the tray back to the window and receive a new tray. *Id.* at ¶ 18. Inmates in RHUs who do not receive their

tray from the chow line can request a replacement tray from a correctional officer. *Id.* If Mr. Hartsock does not alert Aramark or IDOC staff to a problem with his tray, they cannot resolve the problem. *Id.*

Mr. Hartsock's medical records from 2023 were submitted. Dkt. 56-5, dkt. 64-1. The records show that Mr. Hartsock meets with medical staff on a regular basis to address issues related to vertigo, migraines, and photosensitivity. *See generally, id.* Nothing in the records indicate that Mr. Hartsock is suffering from a serious illness, such as persistent vomiting, diarrhea, or unexplained weight loss, due to the IDOC's vegan diet. *Id.* The documents do show that Mr. Hartsock is provided a supplement to address his vitamin B12 deficiency. Dkt. 56-5 at 5−12. A mental health counselor met with Mr. Hartsock while he was in the RHU on May 26, 2023. *Id.* at 205. The counselor noted that Mr. Hartsock "denied any need for mental health services" but expressed concerns about his vegan diet being contaminated. *Id.* The counselor informed custody staff of these concerns. *Id.*

### iii.     Affidavits from Fellow Inmates

Mr. Hartsock did not file a reply with additional argument, but he provided affidavits from several inmates that the Court summarizes.

John Foradori, an IDOC inmate, attested that he has been on the vegan diet at Putnamville since May 2023. Dkt. 71 at ¶¶ 3−4. He attested that for several months, vegan inmates were not served sealed peanut butter packets while non-vegan inmates did receive them. *Id.* at ¶ 5. By November 2023, vegan inmates again began receiving the peanut butter packets. *Id.* Mr. Foradori also attested that he has never received the "Fruit Drink w/ B12, C, D, E & Calcium" in his vegan dinner sack despite it being listed on the vegan menu. *Id.* at ¶ 6.

Jeremy Johnson, an IDOC inmate, attested that he has worked in the kitchen at Putnamville since October or November 2023. Dkt. 74 at ¶¶ 3−4. Mr. Johnson attested that Aramark staff instructed him to wash serving utensils, pots, and pans together. *Id.* at ¶ 5. He also observed inmates wearing the same gloves when they handled vegan foods as when they handled non-vegan foods. *Id.*

Michael Passmore attested that he, like Mr. Hartsock, has experienced retaliation for filing lawsuits and submitting grievances. Dkt. 70 at 3, ¶ 7. Mr. Passmore's affidavit does not discuss issues related to the vegan diet. *See generally* dkt. 70 at 1−9.

### B. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). To obtain a preliminary injunction a plaintiff first must show that: "(1) without this relief, [he] will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) [he] has some likelihood of prevailing on the merits of [his] claims." *Speech First, Inc. v. Killen*, 968 F.3d 628, 637 (7th Cir. 2020). If the plaintiff meets these threshold requirements, "the court then must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.* "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490. 501 (7th Cir. 2020) (cleaned up).

Further, the Prison Litigation Reform Act ("PLRA") provides: "Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). "This section of the PLRA enforces a point repeatedly made by the Supreme

Court in cases challenging prison conditions: '[P]rison officials have broad administrative and discretionary authority over the institutions they manage.'" *Westerfer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)).

### C. Discussion

Relevant to his requests for injunctive relief, Mr. Hartsock brings claims under the First and Eighth Amendments and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

Both the First Amendment and RLUIPA prohibit prisons from burdening inmates' religious practices in certain instances. *See Neely-Bey Tarik-El v. Conley,* 912 F.3d 989, 1003–04 (7th Cir. 2019). As it relates to religious diets, "forcing an inmate to choose between daily nutrition and religious practice is a substantial burden." *Thompson v. Holm*, 809 F.3d 376, 380 (7th Cir. 2016).

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Thus, one of the duties of prisoner officials "is to ensure that inmates receive adequate food." *Williams v. Shah*, 927 F.3d 476, 479 (7th Cir. 2019). In the context of food safety, prison officials must "provide inmates with 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.'" *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) (quoting *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985)).

To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants'

8

decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022).

For the reasons explained below, Mr. Hartsock has not established the three threshold requirements necessary for preliminary injunctive relief.

### A. Likelihood of Success on the Merits

"A movant's showing of likelihood of success on the merits must be strong." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020) (quotation marks omitted). A "better than negligible" likelihood of success is not enough. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762−63 (7th Cir. 2020). "A 'strong' showing ... does not mean proof by a preponderance .... But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.*

Mr. Hartsock has failed to make a strong showing that the vegan diet program administered at Putnamville has either placed a substantial burden on his religious practices or imposed a threat to his health or safety. The cross-contamination of vegan utensils/cookware with non-vegan food items would implicate Mr. Hartsock's religious rights. That is, contaminating a vegan tray by using a utensil or glove that has come into contact with an animal product would not likely make Mr. Hartsock's food dangerous to eat, but it would render it non-vegan. Serving Mr. Hartsock food contaminated with mold or mice feces[1] would implicate Mr. Hartsock's Eighth Amendment rights since such exposure could result in illness. *Byrd v. Hobart*, 761 F. App'x 621, 624 (7th Cir. 2019) (concluding that an unabated pest infestation in a prison kitchen could create an excessive risk to an inmate's health and safety).

---

[1] Though disgusting, the Court acknowledges that the accidental consumption of rodent feces would also implicate Mr. Hartsock's religious rights, as this contaminated food would not be vegan.

9

As a preliminary matter, the IDOC has a vegan diet program in place, and the vegan menu was prepared by a dietician and provides for specific calorie ranges that meets American Correctional Association standards. Dkt. 56-1 at ¶¶ 10−12; dkt. 58-1 at ¶ 9.

With respect to cross-contamination, Ms. Smith's affidavit demonstrates that, as a matter of policy, vegan dishes are prepared using special vegan-only utensils and pots and pans that have been sanitized before being used for vegan dishes. Dkts. 58-1 at ¶¶ 7−8. Mr. Hartsock's evidence, including the affidavit from kitchen worker Johnson, shows that this policy may not be followed perfectly. That is, inmate workers have been observed cross contaminating vegan and non-vegan foods through their undisciplined use of the utensils or by not changing gloves. Dkt. 74 at ¶ 5. But Mr. Hartsock acknowledges that he does not request replacement trays when he observes these problems because he fears retribution from inmate workers. Dkt. 24 at 2, ¶ 9. Thus, Mr. Hartsock's inaction prevents Ms. Smith or other Aramark employees from being able to correct this behavior. Dkt. 58-1 at ¶ 18. "Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). If a defendant is unaware of a problem with a particular vegan tray when the problem occurs, he or she can do nothing to remedy the issue.

Mr. Hartsock has also failed to show that the vegan food he is served is unsafe due to mold or rodent feces. The defendants' evidence shows that the Putnamville kitchen passed two inspections in 2023, and no evidence of vermin was found. Dkt. 56-1 at ¶¶ 13−14. The IDOC provides pest control services to keep rodents out of the kitchen, and on the rare occasion that rodents or their feces are observed in or near any food, that food is thrown away. Dkt. 58-1 at ¶ 14. Further, Mr. Hartsock has the option of requesting a replacement tray if he finds unsafe contaminants in his meals, but he has not done so. Dkt. 24 at 2, ¶ 9. Mr. Hartsock did mention a

few occasions where correctional staff in the RHU refused to provide him replacement trays, dkt. 24 at 4, ¶ 19, but since he is no longer housed in an RHU, Mr. Hartsock cannot demonstrate that this is an ongoing issue that requires Court intervention.

Neither IDOC nor Aramark Defendants addressed the use of Styrofoam trays in their briefs. Dkts. 56, 58. The U.S. Food and Drug Administration has determined that it is safe to serve foods on Styrofoam. *See* 21 C.F.R. § 177.1640 (providing that polystyrene—what Styrofoam is made of—is safe for use in contact with food). Although it is generally not recommended to heat Styrofoam containers in a microwave,[2] Mr. Hartsock's claims that the trays are placed on or near heat sources is too vague to afford him injunctive relief on this issue.

Mr. Hartsock has presented colorable claims that he has experienced retaliation, but there is no evidence that the defendants' retaliatory behavior is having any ongoing impact on his access to the vegan diet. Mr. Hartsock alleged that two defendants conspired to change his diet from vegan to a lacto diet and confiscated his vegan card to prevent him from accessing vegan food. Dkt. 24 at 6 ¶¶ 29−30. He also alleged that Aramark staff stopped serving peanut butter packets to vegan inmates while still serving them to non-vegan inmates. *Id.* at ¶ 28. But it's undisputed that Mr. Hartsock is again on the vegan diet, dkt. 56-1 at ¶ 9, and that vegan inmates are again receiving peanut butter packets, dkt. 71 at ¶ 5. Thus, Mr. Hartsock is not entitled to vegan diet-related injunctive relief with respect to his retaliation claim.

### B. Irreparable Harm

Irreparable harm is "harm that 'cannot be repaired' and for which money compensation is inadequate." *Orr*, 953 F.3d at 502 (quoting *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th

---

[2] *See, e.g.* Caitlin McLean, USA TODAY, "Is it safe to microwave food in Styrofoam containers? It depends.", *available at* https://www.usatoday.com/story/life/food-dining/2022/07/07/can-you-microwave-styrofoam/7815128001/ (last updated Aug. 1, 2022).

Cir. 1997)). The plaintiff must show "that he will *likely* suffer irreparable harm absent obtaining preliminary injunctive relief." *Id.* (cleaned up).

Mr. Hartsock has not shown that he will suffer irreparable harm. Mr. Hartsock has presented no evidence that demonstrates he is at risk of a serious illness due to the vegan diet provided at Putnamville. Mr. Hartsock notes that he has a Vitamin B12 deficiency. Mr. Hartsock presented an information sheet about Vitamin B12 deficiency which indicates that his deficiency is likely due to adhering to a vegan diet. Dkt. 24-1 at 3 (noting that "[e]ating a strict vegetarian diet" may cause a lack of vitamin B12). But Mr. Hartsock's medical records show that he receives Vitamin B12 supplements. Dkt. 56-5 at 5−12. And his medical records are silent as to any other medical issues that may be related to his vegan diet. Thus, he has not shown he will be subjected to irreparable harm.

### C. Inadequate Legal Remedies

"The moving party must also demonstrate that he has no adequate remedy at law should the preliminary injunction not issue." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017). "This does not require that he demonstrate that the remedy be wholly ineffectual." *Id*. (citing *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). "Rather, he must demonstrate that any award would be seriously deficient as compared to the harm suffered." *Id.* (quoting *Foodcomm*, 328 F.3d at 304). For the foregoing reasons, Mr. Hartsock has not shown that he has no adequate remedy absent injunctive relief.

Because Mr. Hartsock has not met the three threshold elements, the Court need not proceed to the balancing phase. Mr. Hartsock's motions for preliminary injunction, dkts. [5] and [22], are **denied**. However, the Court emphasizes that these findings are based on a nascent record. Mr. Hartsock has not demonstrated at this early stage of the proceedings that he is entitled to the

"extraordinary equitable remedy" of injunctive relief, *Turner*, 765 F.3d at 661, but this does not mean that his claims wholly lack merit. *See, e.g. Sports Form, Inc. v. United Press Intern., Inc.*, 686 F.2d 750, 753 (9th Cir. 1982) (observing that a district court's findings on a motion for preliminary injunction are restricted to the limited record before it, and the court's evaluation of the case may change after presentation of all the evidence).

## II. Motion Challenging Plaintiff's Entitlement to *In Forma Pauperis* Status

The *in forma pauperis* statute provides that

> In no event shall a prisoner bring a civil action . . . under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

On three or more occasions before filing the complaint in this case, Mr. Hartsock brought civil actions in federal court that were dismissed for failure to state a claim upon which relief may be granted. *See Hartsock v. IDOC*, 2:23-cv-45-JPH-MG, dkt. 7 (S.D. Ind. Feb. 3, 2023) (listing cases).

When the Court screened Mr. Hartsock's complaint, it permitted him to proceed under the "imminent danger" exception due to Mr. Hartsock's allegations that he qualifies due to his persistent vomiting, diarrhea, vitamin B12 deficiency, back pain, and mental health effects of the vegan diet. Dkt. 10 at 2. The screening order provided, however, that the defendants could challenge Mr. Hartsock's entitlement to pauper status by submitting evidence disputing his allegations of imminent danger. *Id.* (citing *Gorbey v. USP Thompson*, No. 22-2129, 2023 WL 2755587 (7th Cir. Apr. 3, 2023) (citing *Sanders v. Melvin*, 873 F.3d 957, 962 (7th Cir. 2017))).

13

IDOC Defendants have done so. In their motion challenging Mr. Hartsock's entitlement to pauper status, they argue that he is provided a vegan diet with sufficient calories and his medical records do not suggest malnutrition or other medical concerns related to his diet. Dkt. 57 at 1−2. The Court agrees.

To be entitled to *in forma pauperis* status under the imminent danger exception, a plaintiff must show that "time is pressing" and the potential consequence of being denied access to the court is "serious physical injury." *Lewis v. Sullivan*, 279 F.3d 526, 541 (7th Cir. 2002). Although Mr. Hartsock alleged that he suffered from various maladies (vomiting, diarrhea, weight loss) that could result in serious physical injury, neither his affidavit nor his medical records reflect that he has been treated for any serious illness related to his vegan diet. As noted above, his vitamin B12 deficiency may be related to his vegan diet, but he receives vitamin supplements to combat the deficiency. Although he discussed suffering from mental health issues resulting from the perceived inadequacies with the vegan diet, there is no evidence from the medical records or his affidavit that he has engaged in self-harm or has experienced other physical injuries due to mental health suffering. *Cf. Sanders*, 873 F.3d at 961(concluding that plaintiff's allegations that he engages in self-harm due to mental health issues is sufficient to qualify him for the imminent danger exception). In short, there is no evidence in the record that Mr. Hartsock's vegan diet is placing him in imminent danger of serious physical injury.[3] Accordingly, IDOC Defendants' motion challenging Mr. Hartsock's entitlement to *in forma pauperis* status, dkt. [57], is **granted**, and Mr. Hartsock "must pay the whole filing fee promptly." *Sanders*, 873 F.3d at 961.

---

[3] The Court observes that Mr. Hartsock is proceeding under the imminent danger in another case filed in this Court concerning his severe migraines, photosensitivity, and vertigo. *Hartsock v. Snowden, et al.*, 2:23-cv-477-MPB-MKK. The Court's decision in this case regarding his entitlement to pauper status under the imminent danger exception has no bearing on his entitlement to the status in that case.

The filing fee for a civil action is $405.00. Mr. Hartsock has already paid $79.25 of the filing fee. Thus, he owes $325.75, and he has **through February 20, 2024**, to pay this sum, or this action will be dismissed.

### III. Motion for Counsel

Mr. Hartsock filed a motion for assistance recruiting counsel. Dkt. 66. Litigants in federal civil cases do not have a constitutional or statutory right to court-appointed counsel. *Walker v. Price*, 900 F.3d 933, 938 (7th Cir. 2018). Instead, 28 U.S.C. § 1915(e)(1) gives courts the authority to "request" counsel. *Mallard v. United States District Court*, 490 U.S. 296, 300 (1989). As a practical matter, there are not enough lawyers willing and qualified to accept a pro bono assignment in every pro se case. *See Watts v. Kidman*, 42 F.4th 755, 764 (7th Cir. 2022) (explaining that courts must be careful stewards of the limited resource of volunteer lawyers); *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014) ("Whether to recruit an attorney is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.").

"'When confronted with a request under § 1915(e)(1) for pro bono counsel, the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (quoting *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007)). These two questions "must guide" the Court's determination whether to attempt to recruit counsel. *Id.* These questions require an individualized assessment of the plaintiff, the claims, and the stage of litigation. *See Pruitt*, 503 F.3d at 655-56.

15

The first question, whether litigants have made a reasonable attempt to secure private counsel on their own, "is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." *Eagan*, 987 F.3d at 682. Mr. Hartsock has attempted to contact multiple attorneys with requests for representation without success. The Court finds that he has made a reasonable effort to recruit counsel on his own before seeking the Court's assistance. He should continue his efforts to find counsel.

"The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims himself." *Eagan*, 987 F.3d at 682 (citing *Pruitt*, 503 F.3d at 655). "The court's competency evaluation should account for 'the plaintiff's literacy, communication skills, educational level, and litigation experience,' and, to the extent that such evidence is before the court, information 'bearing on the plaintiff's intellectual capacity and psychological history.'" *Watts*, 42 F.4th at 760 (quoting *Pruitt*, 503 F.3d at 655). "Specifically, courts should consider 'whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself.'" *Eagan,* 987 F.3d at 682 (quoting *Pruitt,* 503 F.3d at 655). "This assessment of the plaintiff's apparent competence extends beyond the trial stage of proceedings; it must include 'the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial.'" *Id.* (quoting *Pruitt,* 503 F.3d at 655).

Mr. Hartsock alleges that he needs the assistance of counsel because he suffers from severe photosensitivity and Defendant Bumgardner revoked an accommodation wherein he could scan his legal documents into a computer and enlarge them to make them easier to read. Dkt. 66 at 3. In response to the Court's order screening Mr. Hartsock's amended complaint, dkt. 59, Ms.

Bumgardner explained that Mr. Hartsock had never requested an ADA accommodation of this nature, so there was no accommodation to reinstate. Dkt. 63; *see also* dkt. 63-1 (affidavit of Putnamville ADA coordinator Heather Russell explaining that Mr. Hartsock has not requested this type of accommodation but is welcome to do so). Mr. Hartsock also alleges that there are problems with the computers in Putnamville's law library and that "Lexis Nexus rarely works here." *Id.* at 3.

Mr. Hartsock's filings before he was no longer permitted to scan his documents demonstrate that he is a capable pro se litigant. He cited applicable case law in his briefs in support of his motions for preliminary injunction and gathered and presented relevant evidence in the form of affidavits by him and other inmates. The Court observes that Mr. Hartsock was able to collect and submit the inmates' affidavits after he was no longer allowed to scan documents. It appears that Mr. Hartsock has a channel for receiving an ADA accommodation, and it is not clear that he has availed himself of that opportunity since alerting the Court to this issue. Further, Mr. Hartsock can file motions for additional time to respond to this Court's orders if the problems in the law library limit his ability to prepare such responses. Given Mr. Hartsock's aptitude for identifying relevant legal claims and presenting cogent legal argument, it is not in the interest of justice to recruit counsel for him at this time.

Accordingly, Mr. Hartsock's motion for assistance recruiting counsel is **denied without prejudice**. Dkt. [66]. The Court will remain alert to changes in circumstances that may warrant reconsideration of the motion, such as a settlement conference or trial.

### IV. Conclusion

For the foregoing reasons, Mr. Hartsock's motions for preliminary injunction, dkts. [5] and [22], are **denied**. IDOC Defendants' motion challenging Mr. Hartsock's entitlement to IFP status,

dkt. [57], is **granted**. Mr. Hartsock has **through February 20, 2024**, to pay $325.75, or this action will be dismissed. Mr. Hartsock's motion for counsel, dkt. [66], is **denied.**

    **IT IS SO ORDERED.**

Date: 1/23/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

JOSEPH HARTSOCK
966460
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel